UNITED STATES DISTRICT COURT

DISTRICT OF CONECTICUT



| | |
|---|---|
| JEFFREY NAVIN AND JOHN O'REILLY, on behalf of themselves and of all others similarly situated, Plaintiffs, -v- WELLS FARGO BANK, N.A., WELLS FARGO INSURANCE, INC., ASSURANT, INC., AMERICAN SECURITY INSURANCE COMPANY, AMERICA'S SERVICING COMPANY and HSBC BANK USA, Defendants. | COMPLAINT JURY TRIAL DEMANDED |

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

## AND WITH APPROVAL OF THE COURT A CLASS ACTION COMPLAINT

Plaintiffs Jeffrey Navin and John O'Reilly (Plaintiffs) file this complaint on behalf of themselves and, with court approval, all others similarly situated, allege the following upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on Plaintiffs' personal knowledge, against Wells Fargo Bank, N.A., America's Servicing Company, and Wells Fargo Insurance,. Inc. (collectively, the "Wells Fargo Defendants"), and HSBC Bank, as well as Assurant Inc. and its subsidiary American Security Insurance Company (collectively, "HSBC Defendants"). Except as otherwise

1

provided here, the Wells Fargo Defendants and Assurant Defendants are collectively referred to as "Defendants".

## INTRODUCTION

1. This is an action brought by Plaintiffs Jeffrey Navin and John O'Reilly and with the Court's permission all persons who have or had a residential mortgage loan owned, originated and/or serviced by the Defendants in the State of Connecticut and, in connection therewith, were required to pay for "force-placed" hazard insurance on their secured property and/or who have suffered at the expense of "force-placed" hazard insurance.

2. Plaintiffs alleges that Defendants derived improper financial benefits by imposing force-placed insurance policies on properties, some of which are already covered by homeowners insurance policies purchased by the homeowner. In addition, the Wells Fargo Defendants charged residential borrowers for the "cost" of procuring force-placed insurance from the Assurant Defendants, and other contracted insurance agents of the Wells Fargo Defendants, but from which a portion of such "cost" is returned, transferred or paid to the Wells Fargo Defendants and/or their related entities. Plaintiffs seeks to recover damages equal to the amount of the improper and inequitable financial benefit received by Defendants and/or their affiliates as a result of this anti-consumer practice, and to rescind the future collection of amounts charged against the mortgage accounts of residential borrowers but not yet collected.

3. Mortgage Lenders require borrowers to purchase and agree to maintain hazard insurance coverage on the secured property as a condition to funding home loans. As such, Plaintiffs and members of the putative class were required to obtain and maintain hazard insurance as a condition of their mortgages.

4. In the event that borrowers fail to maintain their hazard insurance policies, rather than attempt to maintain borrowers' existing policies, the Wells Fargo Defendants choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed insurance" or "lender-placed insurance" ("FPI" or "LPI") policies. Such policies provide substantially less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to the loan servicers and/or their affiliates. Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has absolutely no risk of loss or are placed on properties where there is no lapse in coverage.

5. Defendants acted together to exploit the Wells Fargo Defendants' contractual authority to force-place insurance in order to reap additional and unjustified profits in the form of fees, commissions, discounted tracking. services, and other forms of consideration at the expense of borrowers whose insurance was force-placed. These improper fees and charges were not legitimately related to the cost of the force-placed insurance or the purposes for which forceplaced insurance is purchased- to protect the lender's interest in the property.

6. The insurance premiums paid by and/or assessed to Plaintiffs and Class members also included amounts not attributable to the cost of providing force-placed insurance but, instead, constituted expenses associated with servicing the loans. The small percentage of borrowers who were forced to pay for LPI were therefore shouldering the costs of monitoring the Wells Fargo Defendants' entire loan portfolio- effectively providing kickbacks to the Wells Fargo Defendants in the form of subsidies paid by borrowers whose insurance was force-placed. *See* Testimony of Birny Birnbaum on Behalf of the Center for Economic Justice before the Florida Office of Insurance Regulation (July 3, 2012).

7. A November 10, 2010 article in American Banker first revealed that force-placed insurance creates a financial windfall for the major national mortgage lenders. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble,* American Banker (Nov. 10, 2010). Assurant's stock price dropped 11% the day after the American Banker article was published. Notwithstanding the deceptive kickbacks, commissions, and backdating scheme, internal e-mails reveal that numerous bank employees admitted that the rates cited in the American Banker article were "unreasonable" and needed to be changed.

8. Defendants engaged in this conduct in bad faith, knowing that their actions were not authorized by borrowers' mortgage contracts and were inconsistent with applicable law.

9. In this action, Plaintiffs challenges, among other things, Defendants' *decision to purchase* force-placed hazard insurance from insurers that provide an improper financial benefit to Defendants and/or their affiliates and at rates that far exceed borrower-purchased hazard insurance while providing substantially less coverage.

10. Based on this conduct, Plaintiff, on behalf of themselves and similarly situated Class members, asserts claims against the Defendants for breach of contract (Count I), unjust enrichment (Count II), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(c) (Count III), RICO conspiracy (Count IV), breach of fiduciary duty/misappropriation of funds (Count V), aiding and abetting breach of fiduciary duty (Count VI), deceptive trade practices under Connecticut Unfair Trade Practices (CUTPA) C.G.S.A. 42-110b and CUIPA GGSA-38a-816 Connecticut Unfair Insurance Practices and pursuant to 28 U.S.C. § 1367 (Count VII), and declaratory and injunctive relief (Count VIII).

11.  Plaintiffs especially claim further violations of the above aforementioned paragraphs by Defendants' actions when Plaintiffs filed a claim of damage to the property and Defendants sent independent adjustors to adjust the damage, which Defendant Assurant later wrote a check for the damages and kicked it back to America's Servicing Company for Wells Fargo, Wells Fargo Bank and Wells Fargo Insurance Company. Leaving  Plaintiffs with collapsed ceilings, open ceiling mold and exposed insulation and mold between walls and ceiling causing harm to the inhabitants of the property, including a severely asthmatic woman and a totally disabled individual and a Plaintiff, John O'Reilly, on whom a ceiling collapsed.  Based on this conduct, Plaintiffs, on behalf of themselves and similarly situated Class members, asserts claims against the Defendants for breach of contract (Count I), unjust enrichment (Count II), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(c) (Count III), RICO conspiracy (Count IV), breach of fiduciary duty/misappropriation of funds (Count V), aiding and abetting breach of fiduciary duty (Count VI), deceptive trade

5

practices under Connecticut Unfair Trade Practices (CUTPA) C.G.S.A. 42-110b and CUIPA GGSA-38a-816 Connecticut Unfair Insurance Practices and pursuant to 28 U.S.C. § 1367 (Count VII), and declaratory and injunctive relief (Count VIII).


**JURISDICTION AND VENUE**

12. This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Connecticut, are doing business in Connecticut and have registered with the Connecticut Secretary of State, or do sufficient business in Connecticut , have sufficient minimum contacts with Connecticut, or otherwise intentionally avail themselves of the Connecticut consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Connecticut. This purposeful ailment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

13. In addition, this Court has original jurisdiction because the amount in controversy exceeds $75 thousand dollars and diversity exists between the Plaintiffs and the Defendants and there is complete diversity of citizenship between the Plaintiffs and Defendants. 28 U.S.C. § 1332 et seq., the so called Diversity statute.

14. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to Connecticut Unfair Trade Practices (CUTPA) C.G.S.A. 42-110b and CUIPA GGSA-38a-816 Connecticut Unfair Insurance Practices and pursuant to 28 U.S.C. § 1367.

15. This Court further has subject-matter jurisdiction over those of Plaintiffs' claims that arise under RICO, 18 U.S.C. § 1962(d) according to the statute's jurisdictional statement, 18 U.S.C. § 1964.

16. Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District. Venue is also proper here because at all times relevant hereto, Plaintiffs resided in the District of Connecticut and the practices complained of herein occurred in the District of Connecticut.

17. This Court may find jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.). Plaintiffs are citizens of the states of Connecticut. Defendants are citizens of various other states but are registered to do business in the aforementioned state. The court may find that the amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

18. This Court may find that it has subject-matter jurisdiction over Plaintiffs' claims arising under the BHCA, 12 U.S.C. § 1972, *et seq.*, according to the statute's jurisdictional statement, 12 U.S.C. § 1975.

19. All conditions precedent to this action have occurred, been performed, or have been waived.


**PARTIES**

**Plaintiffs**

20. Plaintiffs Jeffrey Navin and John O'Reilly currently, and at all times relevant hereto, reside at 7 Hart Landing in Guilford, Connecticut . Jeffrey Navin is the Owner of the property, and John O'Reilly is the manager of the property.

**Defendants**

21. Defendant **Wells Fargo Bank,** N.A. ("Wells Fargo") is a national bank registered to do business in the State of New Y ark and is headquartered in in San Francisco, California. As a result of a 2004 merger, Wells Fargo Bank is the successor to Wells Fargo Home Mortgage, Inc., which no longer exists. Wells Fargo Bank sometimes does business under the name Well Fargo Home Mortgage. It is Wells Fargo Bank's practice, when it acquires another bank or lender, to become the successor in interest or assign of that bank or lender's home mortgages. For example, in 2008, Wells Fargo Bank acquired Wachovia Bank, NA. ("Wachovia") and is the successor in interest and/or assign of Wachovia as to all Wachovia's home mortgages.

22. Defendant **Wells Fargo Insurance, Inc.** ("Wells Fargo Insurance") is a division of Wells Fargo, N.A. registered to do business in the State of New York with its principal address in Minnesota. Wells Fargo Insurance is a captive insurance agent and primarily an instrumentality of Wells Fargo Bank. Upon information and belief, Wells Fargo Insurance does nothing to assist in obtaining the force-placed insurance policy and exists only so Wells Fargo can collect kickbacks or commissions related to the force-placed insurance policies. Wells Fargo Bank and Well Fargo Insurance may be collectively referred to as "Wells Fargo."

23. Defendant **Assurant, Inc.** ("Assurant") is a Delaware corporation which is headquartered at One Chase Manhattan Plaza, New York, New York 10005. According

to its website, Assurant is a provider of specialized insurance products including "lender-placed" homeowners insurance or FPI. *See* "About Us," http://www.assurant.com/about/ (last accessed Feb. 13, 2013). According to Assurant's 2010 Annual Report as filed on February 23, 2012 with the Securities and Exchange Commission ("SEC") on SEC Form 10-K, "the majority of [Assurant's] lender-placed agreements are exclusive" and those agreements require the Assurant Defendants to "automatically issue these policies when a borrower's insurance coverage is not maintained." Assurant has four operating segments - Assurant Solutions, Assurant Specialty Property, Assurant Health, and Assurant Employee Benefits.

36. Assurant, along with QBE Insurance Group, Ltd., controls about 90% of the force-placed insurance market. *See* Mary Williams Walsh, *New York Investigates Insurer Payments to Banks,* N.Y. Times (May 21, 2012). Assurant offers force-placed ("lenderplaced") insurance products through the Assurant Specialty Property segment. "The largest product line within Assurant Specialty Property is homeowners insurance, consisting principally of fire and dwelling hazard insurance offered through [Assurant's] lender-placed programs." Assurant's 2011 Form 10-K filed on February 23, 2012, at 4. Assurant uses "a proprietary insurance-tracking administration system linked with the administrative systems of our clients to continuously monitor the clients' mortgage portfolios to verify the existence of insurance on each mortgaged property and identify those that are uninsured" and when a lapse is confirmed, "a lender-placed policy is procured by the lender." *Id.*

24. Defendant **American Security Insurance Company** ("ASIC") is an insurance company writing force-placed insurance policies in all fifty states and the District of

Columbia with its principal address in Atlanta, Georgia. ASIC is a wholly owned

subsidiary of Interfinancial, Inc., which in turn is a wholly owned subsidiary of Assurant.

ASIC is one of Assurant' s exclusive force-placed insurance providers. Upon information

and belief, ASIC sometimes operates under the trade names Assurant Solutions and

Assurant Specialty Property. On information and belief, ASIC contracts with Wells Fargo

whereby it acts as a force-placed insurance vendor. On information and belief, ASIC' s

duties include, but are not limited to, tracking loans in Wells Fargo's mortgage portfolio,

handling all customer service duties related to force-placed insurance, and securing

force-placed insurance policies on properties when a borrower's insurance has lapsed.

As alleged herein, ASIC force-placed hazard insurance on Plaintiff  Navin's Property.

25.  Defendant HSBC Bank USA National Association has an office and place business

with an address of 3476 State View, Ft. Mill, SC 29715.  This address is America's

Servicing Company, a subsidiary of Wells Fargo Bank and also Wells Fargo Home

Mortgage doing business as America's Servicing Company, a division of Wells Fargo

Bank.

**ADDITIONAL FACTUAL ALLEGATIONS**

**Defendants' Forced Placed Insurance Operations**

26. In order to ensure that the mortgagee's interest in the secured property is

protected, mortgage loan contracts typically allow the lender or third party servicer to

"forceplace" insurance when the borrower fails to maintain the requisite insurance.

Plaintiff and the Class members' mortgage loan contracts contain such provisions

affording the Wells Fargo Defendants the authority to force-place their insurance in the

event of a lapse. The failure of a borrower to maintain hazard insurance is clearly

contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

27. However, Defendants' discretion to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself. Defendants have routinely exceeded the bounds of reasonableness and the spirit, intent and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property, in an effort to reap profits from the borrower which are neither required nor contemplated by the mortgage contract and through other conduct described herein with respect to the force-placement of insurance.

28. Specifically, Plaintiff's mortgage contract, which is a standardized mortgage contract, did not disclose that the lender or loan servicer will receive a financial benefit in connection with force-placed insurance policies. Instead, the contract misrepresents to borrowers that the cost passed on to them is necessary to protect the lender's interest in the secured property.

29. Force-placed insurance policies are almost always more expensive than standard insurance coverage. Reportedly, such policies cost up to ten times more than standard policies. While the FPI policy is for the benefit of the lender, the cost is passed on to the borrower.

**Mortgage Loan Lenders and/or Servicers Commonly Have Undisclosed Lucrative PreArranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

30. The force-placing of insurance policies can be a very lucrative business for lenders and servicers. Typically, the lender and/or servicer selects the force-placed insurance provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit for the provider. The lender and/or servicer benefit by placing the policy either: (a) with an affiliate or (b) with a third party provider that has agreed to share revenue with the lender and/or servicer in the form of a direct commission payment or through a "captive reinsurance agreement" whereby "reinsurance" premiums are ceded to a subsidiary of the lender and/or servicer.

31. Although the Wells Fargo Defendants have tried to keep its own commission arrangement with Assurant secret, it is well-known that Assurant pays millions of dollars in commissions each year to lenders and/or loan servicers, including the Wells Fargo Defendants, that force-place coverage through ASIC or another subsidiary of its parent company Assurant.

32. Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to servicer or to an affiliate posing as an insurance "agent." Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the lender and/or servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider. These "commissions" conferred a benefit on the Defendants that was not authorized by Plaintiff's mortgage agreement.

33. Under the direct payment arrangement, the provider of the force-placed insurance policy pays a portion of the premium collected either directly to the lender and/or servicer or to a subsidiary posing as insurance "agent" as a commission or as a

"reimbursement" of the lender and/or servicer's "incurred expenses" related to force-placing the insurance. Typically, where such payments are commissions, they are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the lender and/or servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.  In the instant action, all proceeds for damages claimed on the policy were kicked back to the lender.

34. Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring lender and/or servicer. In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy. For example, Assurant, the nation's largest provider of force-placed insurance with multiple subsidiaries, including those, as hereinabove alleged, for whom Defendants produce force-placed insurance policies, has acknowledged that its force-placed insurance division "write[s] business produced by clients, such as mortgage lenders and servicers and financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients." *See* Assurant's Annual Report (SEC Form 10-K), at 81 (February 25, 2010).

35. J. Robert Hunter, who is the Director of Insurance at the Consumer Federation of America, described these practices in his testimony before the New York Financial Services

Department ("NYDFS") in connection with the Department's inquiry into force-placed insurance practices: In some instances, lenders use [force-placed] insurance as a profit

13

center by collecting commissions from insurers through lender affiliated agents or broker or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers. *See* Hunter NYDFS Testimony at 1 ("Hunter NYDFS Testimony").  As Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance, testified: Servicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer. With some servicers, the insurance is reinsured through captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage. *See* Birnbaum NYDFS Testimony at 15 ("Birnbaum NYDFS Testimony").Borrowers have no say or input into the carrier or terms of the force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and/or servicer and the insurer, rather than negotiated between the borrower and the insurer.

36. For their part, lenders and/or servicers have no incentive to comparison shop for the best rate. Rather, lenders and/or servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the lender and/or servicer in terms of commission and/or ceded reinsurance premiums that are established as part of the secret arrangements and profit-making scheme established by providers and affiliates. Further, because the servicer' s "commission" and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to

purchase the highest price insurance, an interest diametrically opposed to that of the borrower. *See, e.g. id.,* Hunter NYDFS Testimony at 1.

37. Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance. For example, in its public filings, Assurant-the nation's largest provider of force-placed insurance policies and the parent of ASIC and other subsidiaries with whom Defendants force-place insurance-states that it establishes "long-term relationships" with leading lenders and servicers and that the majority of its lender-placed agreements are exclusive. *See* Assurant's Amended 2010 Form 10-K, at 5 (February 25, 2011) ("The majority of our lender-placed agreements are exclusive.").

**The Incentives and Opportunities for Abuse in the**

**Administration of Force-Placed Insurance**

38. Force-placed insurance policies are not underwritten on an individual policy basis. Rather, servicers' contracts with force-placed insurance providers such as the Assurant Defendants require or at least permit the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

39. As J. Robert Hunter in his testimony before the New York Financial Services Department argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYDFS Testimony at 5. However, the lack of individual underwriting does not result in lower prices for consumers. On the contrary, as a result of the schemes described herein between the banks and servicers, consumers are gouged, and if they make a claim, they may never see any payment of the claim or any repairs to the

damage of the property because all monies or proceeds are kicked back to the co-defendants, namely the lender and its servicer.

40. For example, servicers often go so far as to actually outsource their insurance tracking and processing to the force-placed insurance provider. The provider then continuously monitors the lender's and/or servicer' s mortgage portfolio and verifies the existence (or lack of) of insurance on each mortgaged property. In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the lender and/or servicer. Thus, where these lenders and/or servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Ties to Insurers, *supra.*

41. Upon information and belief, the Wells Fargo Defendants did not monitor their loan portfolios to track insurance coverage. John Frobose, President of ASIC, confirmed this practice, acknowledging that, "ASIC monitors policy status for possible lapses in coverage, such as when a homeowner's standard policy has been cancelled or is about to expire." *See* Frobose NYDFS Testimony.

42. Indeed, during his testimony before the Property and Casualty Insurance (C) and the Market Regulation and Consumer Affairs Committees at the 2012 NAIC Summer National Meeting on August 9, 2012, Joseph Markowicz of PRP Claims - an organization that proclaims claims to have been "Bridging the Lending and Insurance Communities, since 1992" -recognized that force placed insurance premiums include not just the risk incurred, but also "administrative costs undertaken by the LPI carrier on

the lenders behalf, that are bundled into the costs of the premium" which in turn are passed on to "the general public." *See* Joseph Markowicz, **PRP** Claims, NAIC Testimony (Aug. 9, 2012).8 Thus, in return for purchasing higher-priced force placed insurance, insurers such as the Assurant Defendants provide kickbacks to lenders in the form of services, the cost of which is ultimately borne by the mortgagee.

43. These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage. Reportedly, such policies can cost as much as ten times more than standard policies. While the force-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower.

44. Force-placed insurer subsidiaries are highly profitable businesses. "Among a published ranking of companies with the strongest operating insurance subsidiaries, several bank holding companies stand out ... Companies with insurance subsidiaries providing force-placed property insurance were at the top of the list. These included Assurant, Inc. and Bank of America." *See* http://www.mainstreet.com/print/18604 (last accessed Feb. 13. 2013).

45. While lenders and/or servicers such as Defendants profit greatly from the forceplaced insurance scheme, as part and parcel of their effort to maintain a shroud of secrecy over the scheme, servicers do not separately report their income from payments received from providers of force-placed insurance. However, according to an article in *American Banker,* "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year." *See Ties to Insurers, supra* (noting that servicers demand generous commissions and other payments in return for their referrals).

46. Lenders and/or Servicers commonly attempt to justify the high price of forceplaced insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as *American Banker* noted:*Id.*Though part of the extra expense can be explained hy the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry - even after accounting for the generous commissions and other payments that servicers demand.

47. Force-placed insurance providers have tools to assess risk and minimize unexpected risk of loss. According to industry insider John Meadows, "Leveraging technologies and data elements that are available in most servicer's systems, an innovative lender-placed carrier can offer products that take into account relevant property-specific risk characteristics to determine premium rates." *See* John Meadows, *Evaluate Processes and Controls to Ensure Insurance Efficiencies,* Servicing Management, January 5, 2007. Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the Center for Economic Justice, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting non-forced placed insurance policies.

*See* Birnbaum Florida Testimony, *supra.*

48. Birny Birnbaum of the Center for Economic Justice testified that servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence." *See* Birnbaum NYDFS Testimony at 1. A central indicator of the level of risk incurred in a line of insurance is a "loss ratio." Simply put, a loss ratio is a comparison to

the amount of money taken in premiums compared to the amount of money paid out on claims. Loss ratios for FPI have been historically very low, especially when compared to traditional homeowner policies.

49. In his testimony before the NYDFS, Birny Birnbaum presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than thirty-five points higher than the ratios for commercially available homeowners' policies. *Id.* When confined to the period from 2007-2011, the disparity between LPI and hazard insurance loss ratios and those of commercially available homeowners' policies was nearly 42 points. *Id.*

50. Moreover, because the policies are not individually underwritten, the force placed insurer is spared the costs associated with individual underwriting. *Id.* at 26. Defendants Charge Borrowers for Redundant or Otherwise Unnecessary Insurance

51. Unnecessary or inappropriately priced hazard insurance arises when a servicer forces borrowers to purchase and maintain hazard insurance for their property that is unnecessary, duplicative and/or in amounts greater than required by law or their mortgage agreements.

52. Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Defendants have required borrowers to pay for unnecessary insurance coverage. Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for retroactive coverage for by-gone periods of

time for which no risk of loss any longer exists; and (c) requiring borrowers to pay for force-placed insurance policies covering periods of time following a lapse of previous insurance despite the fact that the lender's interest in the property was covered for such time pursuant to either a "standard mortgage clause," in prior policies which extend coverage for a period of time beyond the cancellation date.

**Defendants Forced Placed Hazard Insurance on Plaintiff's Property**
**Pursuant to Lucrative Pre-Arrangement Agreements**

53. As detailed above, Defendants improperly imposed forced-placed hazard insurance on Plaintiff's property. Plaintiff Jeffrey Navin was charged approximately ten thousand dollars per year in premiums for these FPI policies.  When a claim was put in for serious water damage, Defendant Insurant, after agreeing to compensate the claim, took the total proceeds and kicked them back to Wells Fargo and America's Servicing Company. Plaintiffs were left with no repair of the damage and no proceeds from the claim to repair the damage.   Since porous water damage materials are capable of fungi, germination, in as little as 24-48 hours, all porous water damaged materials, such as sheet rock, fiber glass, and carpeting, should be removed and any water leaks or condensation issues be repaired.  Since visible microbial growth was noted on the sheet rock and wood, remediation of all materials should have been conducted using the recommendations of the guidelines issued by the American Conference of Governmental Industrial Hygienist(ACGIH), "Bioacrosols Assessment and Control" and the Environmental Protection Agencies(EPA), "Mold and Remediation" Document published in March 2001.  The inhabitants of the property have been exposed to these

hazardous conditions for almost six months.  The kitchen ceiling collapsed on Plaintiff John O'Reilly, his wife is a severe asthmatic, needing monthly shots and his son is severely disabled with autism.  All have been exposed to this hazard because of defendants' wrongdoing.

**Government Response to Improper Forced Placed Insurance**

54. As referenced above, force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations.

55. State attorneys general have taken action concerning servicers' abusive practices concerning force-placed insurance. A coalition of forty-nine ( 49) state attorneys general entered into an historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com (last accessed Feb. 13, 2013), the official website established by the government relating to the settlement. *See also* Jeff Horwitz, Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker (Mar. 10, 2011).

56. Among other terms, the proposed settlement would essentially prohibit servicers from profiting from force placed insurance. Specifically, under the proposed settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on

the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id.; see also* Consent Judgment, *United States of America v. Bank of America Corp.,* Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

57. Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry- which also had a relatively low level of losses- as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See, e.g.* Broderick Perkins, Title Insurance Industry in Hot Water with Regulators Again, San Jose Business Journal (May 22, 2005).

58. Fannie Mae has also changed its policies to curb bank and servicers' improper practices. On March 14, 2012, Fannie Mae issued a Service Guide Announcement "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry (such as those engaged in by Defendants) including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:  any lender-placed insurance commission earned on that policy by the servicer or any related entity; *Id.* at 4.

• costs associated with insurance tracking or administration, or;

• any other costs beyond the actual cost of the lender-placed insurance policy premium.

59. The force-placed insurance practices of lenders, servicers and insurance companies have come under increased scrutiny recently by regulatory authorities. In October 2011, a number of mortgage servicers and insurers received subpoenas from the NYDFS with respect to lender-placed insurance activities dating back to September 2005. In connection with its investigation of the force-placed insurance practices of lenders and insurers, the NYDFS sent formal document requests to a number of insurers that engage in the business of force-placed insurance. *See* Press Release, N.Y. Dep't of Fin. Servs., Department of Financial Services Expands Probe into Force-Placed Insurance, Demanding Explanation for High Rates; Will Hold Public Hearings (Apr. 5, 2012).

60. The NYDFS also convened hearings on May 17, 18 and 21, 2012, to investigate the force-placed insurance industry. On the opening day of these hearings, NYDFS Superintendent Benjamin Lawsky noted that his department's initial inquiry uncovered "serious concerns and red flags" which included: (a) exponentially higher premiums for force-placed insurance than regular homeowners insurance; (b) extraordinarily low loss ratios; (c) harm to distressed borrowers; (d) lack of competition in the market; (e) increased reliance on force placed insurance as a major profit center for both banks and insurers; and (f) "tight relationships between banks, their subsidiaries and insurers." *See* Opening Statement of Benjamin M. Law sky, Superintendent of Financial Services (May 17, 20 12). As Superintendent Lawsky summarized, the net result of these practices: Take[] the form of large commissions being paid by insurers to the banks for what appears to be very little. In other cases, banks have set up reinsurance subsidiaries

who take over the risk from the insurance companies. Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements. In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions .... *Id.* at p. 8

61. The force-placed insurance practices of the Assurant Defendants, and their lender partners, were front and center at the NYDFS hearings. *See, e.g.,* John Frobose, President of ASIC, Written Testimony in Response to April 12, 2012 NYDFS Notice of Public Hearings; Birny Birnbaum, Center for Economic Justice, Testimony Before New NYDFS on Force-Placed Insurance (May 21 , 2012); and J. Robert Hunter, Consumer Federation of America, Testimony Before New NYDFS on Force-Placed Insurance (May 17, 2012); *see also* Assurant's Form 10-K for the year ending December 31, 2011 , filed on February 23, 2012, at F-83 (noting that "on February 7, 2012, the company and two of its insurance subsidiaries (ASIC and American Bankers Insurance Company of Florida) received subpoenas from the [NYDFS] regarding its lender-placed insurance business and related document retention practices").

62. On June 12, 2012, Governor Cuomo's official website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance." It stated: The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing. Also, the DFS discovered that the force-placed insurance market lacks the sort of competition that *Id.* would keep premiums down. In New York, two companies have 90% of the market. In addition, the hearings made clear that force

placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

63. The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is likely unnecessary. For example, during 2009, the Assurant Defendants collected approximately $2.7 billion of premiums through its Specialty Insurance Division, which is overwhelmingly devoted to force-placed insurance. Notably, this insurer paid out only 35% of this amount in claims – undoubtedly some in kick backs to Wells Fargo as in this instant case, instead of paying the claim properly -- although in the company's other lines of business, a 70% claims-to-premiums ratio is the norm. Not surprisingly, far from being an excessive risk, forceplaced insurance is actually this insurer's most profitable product. Birnbaum NYDFS Testimony at 11. Birny Birnbuam, in his testimony before the NYDFS presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than thirty-five points higher than the ratios for commercially available homeowners policies. *Id.* at 9. When confined to the period from 2007-2011, the disparity between LPI hazard insurance loss ratios and those of commercially available homeowners polices was nearly 42 points. *Id.*

64. In addition, the National Association of Insurance Commissioners ("NAIC") is the lead national insurance regulatory organization created and governed by the chief insurance regulators from all 50 states that is charged with establishing standards and best practices, conducts peer review, and coordinates regulatory oversight- recently began investigating forceplaced insurance practices and held public hearings on August

9, 2012 to look into the forceplaced insurance practices of banks and their partners. *See*

Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB*

*Proposes Rules,* PropertyCasualty360.com (Aug. 10, 2012)

65. As *American Banker* observed, "[w]hile servicers that partner with force-placed

insurers customarily perform little of the work in monitoring their portfolios for lapses and

writing policies, payments to them are simply a cost of doing force-placed business."

These costs are ultimately paid by the borrowers and serve to unjustly enrich all

Defendants, including those with whom the borrower has no contractual relationship

such as the Assurant Defendants.

66. Notably, Assurant's public filings indicate that approximately 40% of its forceplaced

insurance division's revenue is allocated to pay for "general expenses." This category

includes commissions/referral fees paid to lenders. In other lines of insurance, overhead

and expenses are usually a much smaller fraction of policyholder claims. *See*

Assurant's Form 10-K for the year ending December 31,2011, filed on February

23,2012, at 61. Indeed, industry analysts have opined that referral fees, commissions

and other payments to bank affiliates explain why insurers' overhead, which is ultimately

pass onto borrowers, is higher- implying paydays for servicers amounting to hundreds

of millions of dollars per year. *See, e.g.,* Birnbaum NYDFS Testimony.

67. Moreover, the commissions paid by Assurant and/or ASIC to its lender-clients are

also the subject of public regulatory filings. For example, ASIC reported to the California

Department of Insurance that it paid more than $1.8 million dollars in commissions and

brokerage expenses in connection with its flood insurance program in 2010.

68. The Wells Fargo Defendants' practices of referring force-placed insurance business to affiliates or otherwise profiting from the force-placement of insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers as commissions have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such kickbacks- to the detriment of consumers.

69. While significant, this figure represents only a sliver of the total amount of commissions paid by the Assurant subsidiary nationwide on all force-placed policies (hazard, flood and wind). According to a recent article published by American Banker, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars each year." *See* Bead on Banks' FPI Policies, *supra.* at ')[106. Even more shocking, is that while these lenders and/or servicers are bringing in hundreds of millions of dollars through its involvement in force-placed insurance, this same practice is forcing many homeowners that are struggling to pay their current mortgage payments into foreclosure.

70. Further, the Wells Fargo Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of forceplaced insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an

incentive or inducement to enter into the transaction." This suppression of competition and subsequent harm to borrowers is a direct result of the scheme alleged herein.

## RICO ALLEGATIONS

71. Plaintiff, and Members of the Class and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

72. Based on Plaintiff's current knowledge, the following persons constitute a group of individual persons associated who constitute a RICO enterprise that is referred to herein as the "Wells Fargo Force-Placed Insurance Enterprise." The Wells Fargo Defendants, the Assurant Defendants, and other insurance producers and entities involved in force-placing insurance on behalf of the Wells Fargo Defendants not named as defendants herein who assist the named defendants in effectuating their scheme to defraud Plaintiff and other borrowers who were required to pay for force-placed hazard insurance.

73. The web of relationships and arrangements among the Defendants funneled profits to Defendants which were generated through their collusive activities. Each Defendant participated in the FPI scheme with the knowledge and collusion of the other participants as described in greater detail herein. As one journalist observed: In the pantheon of modem-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions. Policies are sometimes backdated to cover periods that have already passed. In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the

mortgage company receiving a "service fee" in return for the business. But homeowners don't know that. *See* Dave Lieber, Everyone Profits Off Force-Placed Insurance, Except Homeowner, Star- Telegram (Oct. 1, 2011).

74. The Wells Fargo Force-Placed Insurance Enterprise is an ongoing organization that engages in, and whose activities effect, interstate commerce.

75. While each of the Defendants participated in and are members of the Wells Fargo Force-Placed Insurance Enterprise, they also have an existence separate and distinct from the enterprise. The structure of the enterprise is reflected in the allegations herein. In particular, the Wells Fargo Defendants implemented a plan to exploit its authority as a loan servicer acting on behalf of the mortgagors who owned Plaintiff's and the Members of the Class' mortgages to force-place hazard insurance to protect its interest in Plaintiff's and Members of the Class' mortgaged properties, to purchase high-priced insurance from its exclusive provider Assurant and/or its subsidiaries and affiliates, enriching themselves through the provisions of high-priced force-placed insurance at Plaintiff's and Members of the Class' expense, and in the process used its own affiliates to funnel improper kickbacks in the form of fees, commissions, "rebates," service in kind, and other consideration to it, and thereby generate a profit for itself and the other enterprise participants at Plaintiff's and other borrowers' expense causing injury to Plaintiff's and borrowers' business or property.  When a claim was put in for serious water damage, Defendant Insurant, after agreeing to compensate the claim, took the total proceeds and kicked them back to Wells Fargo and America's Servicing Company. Plaintiffs were left with no repair of the damage and no proceeds from the claim to repair the damage.   Since porous water damage materials are capable of fungi,

germination, in as little as 24-48 hours, all porous water damaged materials, such as

sheet rock, fiber glass, and carpeting, should be removed and any water leaks or

condensation issues be repaired.  Since visible microbial growth was noted on the sheet

rock and wood, remediation of all materials should have been conducted using the

recommendations of the guidelines issued by the American Conference of

Governmental Industrial Hygienist(ACGIH), "Bioacrosols Assessment and Control" and

the Environmental Protection Agencies(EPA), "Mold and Remediation" Document

published in March 2001.  The inhabitants of the property have been exposed to these

hazardous conditions for almost six months.  The kitchen ceiling collapsed on Plaintiff

John O'Reilly, his wife is a severe asthmatic, needing monthly shots and his son is

severely disabled with autism.  All have been exposed to this hazard because of

defendants' wrongdoing.


**Conduct of the RICO Enterprise**

76. As members of the Wells Fargo Force-Placed Insurance Enterprise, Defendants

engaged in the following conduct in furtherance of the aims and objectives of the

enterprise:

(a) the Wells Fargo Defendants exercised (and abused) its authority to forceplace

Plaintiff's and other borrowers' hazard insurance granted it under the terms of the

mortgage contracts for lenders for whom they serviced mortgage loans. Rather than

renewing Plaintiff's and other borrowers' existing policies or obtaining the insurance at a

commercially reasonable price, the Wells Fargo Defendants force-placed the insurance

with its exclusive providers, thus choosing a more expensive policy to enrich itself at Plaintiff's and Members of the Class' expense.

(b) the Wells Fargo Defendants and their affiliates and subsidiaries including the Assurant Defendants in coordination with the Wells Fargo Defendants, provided and administered excessively priced policies charging Plaintiff and other borrowers not only for the cost of their force-placed insurance, but also charging them for the costs of kickbacks, fees, commissions and other consideration in the form of force-placed insurance premiums which were either charged directly to Plaintiff and other borrowers, added to Plaintiff's existing mortgage loan balances or charged to their escrow accounts.

(c) the Wells Fargo Defendants entered into exclusive deals with the Assurant Defendants to force-place hazard insurance on terms incorporating or requiring ancillary services and arrangements designed to generate additional profits which were steered to fellow scheme members.

(d) the Wells Fargo Defendants paid fees, commissions, rebates, "earnouts" and other consideration to the Assurant Defendants, purportedly for their role as "insurance producers" when they did not, in fact, produce any insurance business for the Wells Fargo Defendants or provide legitimate insurance agency services as at all times relevant to this complaint, the Wells Fargo Defendants had entered into exclusive agreements with the Assurant Defendants. In effect, the Wells Fargo Defendants used these arrangements to establish conduits to funnel a portion of Plaintiff's and Members of the Class' premiums back to it.

(e) Defendants colluded to include in the premiums paid by the small number of borrowers whose insurance was force-placed the costs of servicing the Wells Fargo Defendants' entire portfolio of loans (i.e. for portfolio monitoring, tracking and related administrative functions) in addition to the costs directly attributable to force-placing the insurance. This practice operated as a subsidy to the Wells Fargo Defendants, as the loan servicers. The structure created between the Wells Fargo Defendants, the Assurant Defendants, and their affiliates operated to funnel the profits thus derived directly to the Wells Fargo Defendants. *See, e.g.,* Birnbaum Florida Testimony at 1-3, 7. (f) Upon information and belief, the Wells Fargo Defendants' tracking and outsourcing was performed by the Assurant Defendants for little or no charge.

**Defendants' Misrepresentations and Omissions**

77. As set forth herein, the Wells Fargo Defendants and the Assurant Defendants made numerous material misrepresentations, omissions and half-truths to borrowers and others in furtherance of their fraudulent scheme. These misrepresentations, omissions and half-truths created a false impression that Defendants were operating within the bounds of their contractual authority. The intricate and secretive operations of the force-placed insurance scheme, which are of the type that ordinary consumers and borrowers would not be able to be aware of, necessitate Defendants to have made full disclosure of all the relevant facts necessary to avoid misrepresentations, omissions, and half-truths. Instead, Defendants kept the true nature of their activities concealed and borrowers were harmed as a result.

78. In order for Defendants' fraudulent force-placed insurance scheme to be successful, Defendants intentionally maintained the appearance of traditional provision of insurance disguising the improper provision of high cost, duplicative and unnecessary forceplaced insurance as an unremarkable and legitimate transaction when it was not. In order to maintain the illusion of legitimacy, Defendants deceived Plaintiff and Members of the Class by failing to disclose the true nature of their self-dealing, profit making venture.

**Predicate Acts of Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 134**

79. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have engaged in conduct violating each of these laws to effectuate their scheme.

80. For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1341, on two or more occasions, throughout the Class period and up to and including the present, either caused matter and things to be delivered by the Postal Service or by private commercial interstate carriers or knew and agreed that matter and things would be delivered by the Postal Service or by private or commercial interstate carriers, including, as described in greater detail below, loan documents, correspondence relating to the provision of force-placed hazard insurance, such as applications, agreements, checks or money orders, notices, correspondence to Plaintiff and Members of the Class and correspondence and memoranda to and among each other.

81. For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1343, on two or more occasions, through the Class period and up to and including the present, transmitted and received by wire, matter and things, including transfers of money, correspondence, reports, memoranda, manuals, applications and agreements and were transmitted over the telephone or through facsimile, electronic mail and internet.

82. Each of the Defendants sent matter and things via the postal service, private or commercial carrier, wire or other interstate media, inter alia, as described in the foregoing incorporated paragraphs and set forth with specificity below, in furtherance of their scheme to force-place high-cost, unnecessary and duplicative force-placed insurance.

83. These notices, telephone calls, correspondence, and other communications allowed Defendants to execute their plan and were used to perpetuate the misrepresentations and omissions that lay at the core of Defendants' scheme. While providing an outward appearance of legitimacy, they misrepresented the nature and extent of the Wells Fargo Defendants' authority to force-place insurance and misrepresented that Defendants were force-placing insurance to protect the lender's interest in the secured property and omitted to inform Plaintiff and the Class that Defendants were engaging in a self-dealing, profit making enterprise at their expense, and included:

(a) Notices sent by the Wells Fargo Defendants, the Assurant Defendants, or their subsidiaries, with the Wells Fargo Defendants' knowledge and consent, to Plaintiff and Members of the Class informing them of their authority to force-place hazard insurance.

A series of these notices, often referred to as cycle letters, was sent to Plaintiff and each Class member, amounting to hundreds of thousands of mailings in furtherance of the Defendants' scheme.

(b) The Wells Fargo Defendants, the Assurant Defendants, either in their own capacity or through their subsidiaries and/or affiliates, communicated with borrowers who their systems identified as having lapsed insurance, on multiple occasions by written and verbal (telephone) communications. These mailings contained false information, half-truths and/or omitted information necessary for borrowers to understand the nature of the force-placed insurance scheme they were being subjected to by Defendants.

(c) The Assurant Defendants used the wires to monitor and track the Wells Fargo Defendants' loan servicing portfolio and to identify borrowers whose insurance had lapsed. This monitoring and tracking function was done pursuant to the scheme and specifically in an effort to find additional scheme victims.

(d) The Wells Fargo Defendants and the Assurant Defendants mailed policies and declarations to Plaintiff and Members of the Class. These policies and declarations were known to contain half-truths, misinformation and omit critical information needed by borrowers to protect themselves from the scheme.

(e) The Wells Fargo Defendants communicated to Plaintiff and Members of the Class through the mail, email, and on the internet. These communications were in furtherance of the force-placed insurance scheme.

(f) On information and belief, the Wells Fargo Defendants maintain a website through which Plaintiff and Members of the Class could pay for the fraudulently placed

forceplaced insurance premiums and obtain information regarding their escrow accounts.

(g) The Wells Fargo Defendants' website did not contain information necessary for borrowers to understand the true nature and purpose of the force-placed insurance scheme.

(h) The Wells Fargo Defendants and the Assurant Defendants used the wires to establish and manage Plaintiff's and Members of the Class' escrow accounts, including funding and transferring money which should not have been funded or transferred, from the escrow accounts to themselves.

(i) Defendants accepted the improperly-gained payment of money from Plaintiff and Members of the Class through the mail and by computer transfer/payment of funds.

**Pattern of Racketeering Activity**

84. Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering, *i.e.,* indictable violations of 18 U.S.C. §§ 1341 and 1343 as described herein, during the class period. Indeed, Defendants have committed thousands of such acts in connection with the hundreds of thousands of loans for which they force-placed insurance.

85. The multiple acts of racketeering activity that Defendants committed and/or conspired to commit were related to each other, and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

**Defendants' Conduct Caused Direct Injury**

86. Plaintiff and Members of the Class suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment and caused injury to their property and/or business in the following ways:

(a) Defendants force-placed Plaintiff and Members of the Class into high cost policies which resulted in unjust profit to Defendants rather than renewing Plaintiff's and Members of the Class' existing policies or purchasing policies at a commercially reasonable price;

(b) Charging Plaintiff and Members of the Class premiums for high cost, unnecessary and/or duplicative force-placed insurance;

(c) Adding amounts equaling unpaid force-placed insurance premiums to the balance of Plaintiff's and Members of the Class' loans adding to their debt and reducing their equity in their homes; and

(d) Imposing additional costs and debt obligations.

(e) in the present action, When a claim was put in for serious water damage, Defendant Insurant, after agreeing to compensate the claim, took the total proceeds and kicked them back to Wells Fargo and America's Servicing Company.  Plaintiffs were left with no repair of the damage and no proceeds from the claim to repair the damage.   Since porous water damage materials are capable of fungi, germination, in as little as 24-48 hours, all porous water damaged materials, such as sheet rock, fiber glass, and carpeting, should be removed and any water leaks or condensation issues be repaired. Since visible microbial growth was noted on the sheet rock and wood, remediation of all materials should have been conducted using the recommendations of the guidelines issued by the American Conference of Governmental Industrial Hygienist(ACGIH),

"Bioacrosols Assessment and Control" and the Environmental Protection

Agencies(EPA), "Mold and Remediation" Document published in March 2001.  The

inhabitants of the property have been exposed to these hazardous conditions for almost

six months.  The kitchen ceiling collapsed on Plaintiff John O'Reilly, his wife is a severe

asthmatic, needing monthly shots and his son is severely disabled with autism.  All have

been exposed to this hazard because of defendants' wrongdoing.


**Conspiracy Allegations**

87. In violation of 18 U.S.C. 1962(d), Defendants have, as set forth above, conspired to

violate 18 U.S.C. 1962(c). The object of the conspiracy was to generate secret profits

for Defendants through the Defendants' improper and unlawful abuse of the Wells Fargo

Defendants' authority to force-place hazard insurance for borrowers whose hazard

insurance had lapsed. Instead of providing reasonably priced insurance, Defendants

provided unnecessarily high priced policies for unnecessary, duplicative and back dated

force-placed insurance. Defendants acted together and misrepresented the reasons for

the high cost of the insurance and omitted to inform Plaintiff and the Class that they

were making a substantial profit from the provision of force-placed insurance in a

manner inconsistent with their duties and authority granted them under Plaintiff's and

Members of the Class' mortgage contracts.

88. As set forth above, each of the Defendants knowingly, willfully and unlawfully

agreed and combined to conduct or participate, directly or indirectly, in the conduct of

the affairs and activities of the Wells Fargo Force-Placed Insurance Enterprise through

a pattern of racketeering activity, including indictable acts under 18 U.S.C. §§ 1341 and 1343 in violation of 18 U.S.C. § 1962(c).

89. The agreement between and among the Defendants to act in concert to defraud Plaintiff and the Class is evident from the conduct in which each engaged that supported and was used by each to implement the improper, deceptive and misleading fraudulent scheme.

90. Each of the Defendants engaged in multiple overt acts in furtherance of the conspiracy to defraud borrowers who were required by the Wells Fargo Defendants to pay for force-placed insurance, including misrepresenting the true reasons for the high cost of forceplaced insurance and failing to inform borrowers that they were profiting from the transaction at their expense.

(a) The Wells Fargo Defendants, through its exclusive providers of forceplaced insurance and their affiliates and subsidiaries, developed and forwarded misleading notices to Plaintiff and the Class, which did not disclose that it was earning money from the transaction.

(b) By entering into exclusive deals whereby the force-placed insurance providers, the Assurant Defendants and their affiliates and subsidiaries not only charged for the cost of providing force-placed insurance, but also enabled the Wells Fargo Defendants to improperly recoup general servicing costs by charging the small subset of borrowers' whose insurance was force-placed for the costs of servicing the Wells Fargo Defendants' loan portfolio, including such portfolio-wide administrative activities as tracking and monitoring, the costs of which were not properly included in Plaintiff's and other borrowers' force-placed insurance premiums. *See* Birnbaum NYDFS Testimony.

(c) Paying fees, commissions or other consideration to subsidiaries and affiliates for producing insurance business for the Wells Fargo Defendants when they do not perform the traditional role of an insurance broker and do not and did not, in fact, produce any insurance in the traditional sense as the Wells Fargo Defendants entered into exclusive deals with the Assurant Defendants under which it provided all force-placed insurance for the Wells Fargo Defendants. Indeed, the Assurant Defendants did not perform any of the traditional duties of insurance producer, such as evaluating the individual needs of the policy holder or seeking the most competitive price for the borrower. *Id.*

## CLASS ACTION ALLEGATIONS

91. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(l), (b)(2) and/or (b)(3) on behalf of the following Class:

All persons or entities in the State of Connecticut who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Wells Fargo Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries (the "Class").

92. The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

93. The membership in the proposed Class is so numerous that joinder of all members is impracticable.

94. A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

95. Plaintiff's claims are typical of the claims of the Class.

96. There are questions of law and fact common to the Class, which will generate common answers central to the resolution of the case. These include but are not limited to:

(a) The nature, scope and implementation of Defendants' unlawful, improper and fraudulent acts;

(b) Whether Defendants conspired in furtherance of the unlawful acts alleged herein;

(c) Whether Defendants have engaged in mail and wire fraud;

(d) Whether Defendants have engaged in a pattern of racketeering activity;

(e) Whether the Wells Fargo Force-Placed Insurance Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(f) Whether Defendants conducted or participated in the affairs of the Wells Fargo Force-Placed Insurance Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(g) Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to Plaintiff's and members of the Class' business or property;

(h) Whether Defendants misrepresented the reason for the high cost of forceplaced insurance;

(i) Whether Defendants misrepresented that the Plaintiff's and members of the Class' mortgage contracts authorized them to force-place insurance in the manner they did;

(j) Whether Defendants fraudulently concealed their scheme;

(k) Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

(1) Whether the Wells Fargo Defendants maintained a policy of referring force-placed insurance business to affiliates;

(m) Whether the Wells Fargo Defendants breached the terms of Plaintiff's and members of the Class' mortgages or loan contracts;

(n) Whether the Wells Fargo Defendants breached its fiduciary duty to Plaintiff and members of the Class;

( o) Whether the Assurant Defendants induced and/or participated in the Wells Fargo Defendants' breach of fiduciary duty.

(p) Whether the Wells Fargo Defendants received commission payments from force-placed insurance providers;

( q) Whether the Wells Fargo Defendants received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to any bona fide service in connection with the force-placed insurance and its purpose;

(r) Whether Defendants wrongfully backdated forced-placed insurance policies;

(s) Whether Defendants violated their implied covenant of good faith and fair dealing;

(t) Whether the Wells Fargo Defendants intentionally or negligently made material misrepresentations and omissions to Plaintiff and the Class regarding its procurement of FPI policies from the Assurant Defendants and/or their affiliates or subsidiaries;

(u) Whether Defendants' conduct constituted an unfair, unlawful or fraudulent business practice in violation of the various states' deceptive and unfair trade practice laws;

(v) Whether Defendants received financial benefits from the force-placed insurance provider in the form of monitoring, tracking and processing services;

(w) Whether the provision in the Wells Fargo Defendants' standard residential mortgage agreements authorizing the Wells Fargo Defendants to charge borrowers for the "cost" of obtaining FPI is procedurally and substantively unconscionable because it does not authorize nor contemplate that the Wells Fargo Defendants and/or its related entities would derive a hidden financial benefit by procuring FPI from the Assurant Defendants and/or their affiliates and subsidiaries, and where a portion of the amounts charged to residential borrowers' accounts are returned, transferred or paid to the Wells Fargo Defendants and/or related entities;

(x) Whether the Assurant Defendants has been unjustly enriched by charging residential borrowers amounts for FPI procured from the Assurant Defendants and/or their affiliates and subsidiaries; a portion of which were returned, transferred or paid to the Wells Fargo Defendants or to its related entities;

(y) Whether Defendants or their affiliates participated in arrangements that involved kickbacks; and kickbacks of monies for payment of claims for damages; and

(z) Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages.

97. These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Members of the Class.

98. Plaintiff will fairly represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class.

99. Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

100. Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

101. Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

102. Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE

### (PLAINTIFFS, INDIVIDUALLY, AND ON BEHALF OF THE CLASS AGAINST THE WELLS FARGO DEFENDANTS)

## BREACH OF CONTRACT

## (INCLUDING IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

103. Plaintiffs hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

104. The Wells Fargo Defendants serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

105. Every contract contains an implied covenant of good faith and fair dealing.

106. In all of their actions described herein, the Wells Fargo Defendants acted on their own behalf and as the duly authorized agent of the owner or assignee of the mortgage agreements of Plaintiff and the Members of the Class. The Wells Fargo Defendants were contractually obligated to service the loans of Plaintiff and the Members of the Class pursuant to the terms of their mortgage agreements.

107. The mortgage contracts of Plaintiff and the Members of the Class contained an implied covenant of good faith and fair dealing, pursuant to which the Wells Fargo Defendants were bound to exercise the discretion afforded them under the mortgage contract in good faith and to deal fairly with Plaintiff and the Members of the Class in that regard. The Wells Fargo Defendants is not allowed to evade the spirit of the mortgage contract by exercising discretion afforded them under the mortgage to force place insurance in a manner abusive to borrowers.

108. Any discretionary authority granted to the Wells Fargo Defendants under the terms of Plaintiff's and the Members of the Class' mortgage contracts was subject to the Wells Fargo Defendants' implied duty of good faith and fair dealing. Accordingly, to the extent that the mortgage contracts of Plaintiff and the Members of the Class permitted the

Wells Fargo Defendants to unilaterally "force-place" insurance, the Wells Fargo

Defendants were obligated not to exercise their discretion to do so in bad faith for their

own financial gain for the purposes of maximizing profits at borrowers' expense.

109. The Wells Fargo Defendants breached their duties of good faith and fair dealing in

at least the following respects, among others:

(a) They received kick-backs for claim damages without ever attempting to repair the

damage and left the occupants of the property in danger of collapse, mold, and other

hazards.

(b) Failing to make any effort whatsoever to maintain borrowers' existing insurance

policies and, instead-for the sole purpose of maximizing their own profits-forcing

borrowers to pay for insurance policies from providers of the Wells Fargo Defendants'

choice, such as the Assurant Defendants. These policies needlessly came with

substantially greater premiums and less coverage than borrowers' existing policies,

while providing an improper financial benefit to the Wells Fargo Defendants and/or its

affiliates;

(c) Using their discretion to choose a force-placed insurance provider and policy in bad

faith and in contravention of the parties' reasonable expectations by purposefully forcing

borrowers to pay for more than the cost of protecting the lender's interest in the secured

property;

(d) Failing to seek competitively priced insurance on the open market and instead

selecting force-placed insurance providers according to pre-arranged secret deal

whereby the insurance policies were continually purchased through the same

companies;

(e) Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiff and the Members of the Class and misrepresenting the reason for the cost of the policies;

(f) Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(g) Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a "standard mortgage clause" and/or a Lender's Loss Payable Endorsement;

(h) Procuring force-placed insurance policies to cover time periods during the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement; and

(i) Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom the Wells Fargo Defendants had a reinsurance or commission arrangement or an affiliate relationship.

110. Further, to the extent that the mortgage contracts of Plaintiff and the Class permitted the Wells Fargo Defendants to unilaterally "force-place" insurance, the Wells Fargo Defendants was contractually permitted to do so only to the extent required to reasonably protect the mortgagee's interest in the secured property.

111. Nonetheless, the Wells Fargo Defendants have imposed or collected amounts that exceeded the amounts required to protect the mortgagee's interest in the policy. Such practices have included, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring

borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement or standard mortgage clause that already protects the lender's interest in the property.

112. By force-placing insurance that goes well beyond the pale of what is required to protect their interests, the Wells Fargo Defendants has breached express contractual obligations owed to Plaintiff and the Members of the Class.

113. As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing and the express terms of the mortgage contracts, Plaintiff and the Members of the Class have suffered damages and are entitled to the relief sought herein for such breaches of contract.

**COUNT TWO**

**(PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF THE CLASS AGAINST ASSURANT DEFENDANTS)**

**UNJUST ENRICHMENT/DISGORGEMENT**

114. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

115. Plaintiff Navin and the Members of the Class have conferred a substantial benefit upon the Assurant Defendants derived from the force-placed insurance premiums paid by Plaintiff and the Members of the Class.

116. By, among other things, providing unnecessary and exorbitantly priced FPI policies on the properties of Plaintiff and the members of the Class pursuant to its exclusive contract with the Wells Fargo Defendants, and by backdating policies, the Assurant Defendants were able to collect substantial premiums for unnecessary and unusable property insurance coverage. The Assurant Defendants were unjustly enriched by these practices.

117. These payments were accepted and retained by the Assurant Defendants under circumstances such that it would be inequitable for the Assurant Defendants to retain the benefit without payment to Plaintiff and the members of the Class.

118. As a result of the Assurant Defendants' unjust enrichment, Plaintiff and the Members of the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of the Assurant Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

119. Further, Plaintiff and the Members of the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by the Assurant Defendants as a result of their unfair, unlawful and/or deceptive practices.

**COUNT THREE**

**(PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS)**

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 28 § U.S.C. 1962(C)- RICO**

120. Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

121. This claim for relief arises under 18 U.S.C. § 1964(c).

122. Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity .... "

123. As set forth above (particularly in <[<[82-101) and in the succeeding paragraphs, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Wells Fargo Force-Placed Insurance Enterprise, through a pattern of racketeering acts indictable under 18 U.S.C. §§ 1341 and 1343 which resulted in injury to Plaintiff and the Class.

124. As a direct and proximate result, Plaintiffs and Members of the Class have been injured in their business or property by predicate acts, which make up the Defendants' pattern of racketeering activity as described herein.

## COUNT FOUR

### (PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS)

### VIOLATION OF THE RACKETEER INFLUENCED AND

### CORRUPT ORGANIZATIONS ACT, 28 U.S.C. § 1962(D)- RICO CONSPIRACY

125. Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

126. This claim for relief arises under 18 U.S.C. § 1964(d).

127. In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Wells Fargo Force-Placed Insurance Enterprise.

128. As a direct and proximate result, Plaintiffs and Members of the Class have been injured in their business or property by predicate acts which make up the Defendants' pattern of racketeering activity as described herein.

**COUNT FIVE**

**(PLAINTIFFS INDIVIDUALLY ON BEHALF OF THE CLASS AGAINST THE ASSURANT DEFENDANTS)**

**<u>AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY</u>**

129. Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

130. The Wells Fargo Defendants breached its fiduciary duties to Plaintiff and the Class as set forth hereinabove, including specifically as set forth in Count Five.

131. The Assurant Defendants actively induced and/or participated in the Wells Fargo Defendants' breach of fiduciary duties through the conduct described hereinabove, including, but not limited to, offering the Wells Fargo Defendants the opportunity to reap additional profits and facilitating the realization of such profits through a scheme to force-place borrowers serviced by the Wells Fargo Defendants in unnecessary, duplicative and exorbitantly priced force-placed insurance and tracking services sold by the Assurant Defendants, in exchange for kickbacks, sham commissions, fees for sham services and "rebates" paid to the Wells Fargo Defendants.

132. The Assurant Defendants actively induced and/or participated in the Wells Fargo

Defendants' breach of fiduciary duties through the provision of tracking services that identified and implemented the force-placement of Plaintiff and members of the Class in unnecessary, duplicative and exorbitantly priced hazard insurance and facilitated the billing and payment for  such insurance.

133. As a result if the breach of fiduciary duties to Plaintiffs and members of the Class by the Wells Fargo Defendants that the Assurant Defendants induced and/or participated in as hereinabove described, Plaintiffs and members of the Class suffered damages in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts, and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

134. Plaintiffs and the Class are entitled to all damages resulting from the Wells Fargo Defendants' breach of their fiduciary obligations and misappropriation of escrow funds and the Assurant Defendants are liable for these damages by virtue of their conduct aiding and abetting the Wells Fargo Defendants' wrongful conduct.

### COUNT SIX

### CUTPA CONNECT UNFAIR TRADE PRACTICES,C.G.S.A. 42-110b AND CUIPA

### CONNECTICUT UNFAIR INSURANCE ACT G.C.S.A. 38a-816 AND 28 U.S.C. 1367

### (PLAINTIFFS INIDIVIDUALLY ON BEHALF OF THE CLASS AGAINST ALL

### DEFENDANTS)

### VIOLATION OF SECTION 349 OF THE NEW YORK GENERAL BUSINESS LAW

135. Plaintiffs hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

136. CUTPA AND CUIPA provide that Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are unlawful.

137. Defendants' business practices alleged herein are deceptive acts or practices and, thus, constitute multiple, separate violations of CUTPA and CUIPA. Those deceptive acts and practice include, but are not limited to, the following:

(a) Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead-for the sole purpose of maximizing its own financial gain purchasing and charging borrowers for force-placed insurance policies from providers of Defendants' choice, such as ASIC. These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b) Using its discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c) Selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased through the same companies;

(d) Assessing excessive, unreasonable and unnecessary insurance policy premiums against Plaintiff and the Class and misrepresenting the reason for the cost of the policies;

(e) Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(f) Misrepresenting in its force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss Payable Endorsement or standard mortgage clause;

(g) Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement or standard mortgage clause; and

(h) Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Defendant had a commission arrangement or an affiliate relationship;

(i) Misrepresenting that the charges imposed for force-placed insurance were to protect the borrowers' and Defendants' "mutual interests in the property" and that any portions of the premiums returned to Defendants were for expense incurred in connection with forced-placing insurance; and

G) Engaging in other unfair or unlawful conduct as described in this Complaint.

138. Defendants engaged in these deceptive acts or practices in the conduct of business, trade or commerce in the State of Connecticut.

139. Defendants' communications with Plaintiff and the Class members in which they notify mortgagees that force placed insurance has been or will be purchased on the mortgaged property and communications or documents which purport to describe or

proscribe the Defendants' practices of force-placed insurance are directed to consumers as that term is defined under the Connecticut General Business Law.

## COUNT SEVEN

## (PLAINTIFFS INDIVIUALLY AND ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS)

### DECLARATORY AND INJUNCTIVE RELIEF

140. Plaintiffs hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

141. On each cause of action stated above, Plaintiffs and the Class will be irreparably injured in the future by the Defendants' misconduct.

142. Plaintiffs, on behalf of themselves and all members of the Class, seek a judgment declaring that Defendants must cease the activities described herein, provide the Class with adequate remedies, including, without limitation, refunds and/or credits of all unfair, unlawful or otherwise improper force-placed insurance charges and provide for adequate procedures and policies to ensure that Defendants' unlawful conduct does not continue. Such policies and procedures should include, without limitation, that Defendants: (a) are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the lender's interest in the mortgaged property; (c) are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) must make reasonable efforts to continue or reestablish the

borrower's *existing* insurance policy if there is a lapse in payment; and (e) must purchase any force-placed insurance for a commercially reasonable price.

143. Plaintiffs and the Class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

144. By reason of the foregoing, Plaintiffs and the Class are entitled to declaratory and injunctive relief as set forth herein.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A. That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B. That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C. An award of treble the amount of damages suffered by Plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses pursuant to 18 U.S.C. §§ 1962 (c) and (d);

D. Compensatory, consequential, and general damages in an amount to be determined at trial;

E. Costs and punitive damages;

F. Restitution of all improperly collected funds and/or disgorgement of Defendants' ill-

gotten gains, and the imposition of an equitable constructive trust over all such amounts

for the benefit of the Class;

G. Declaratory and injunctive relief enjoining the misconduct described herein;

H. Pre- and post-judgment interest;

K. Reasonable attorneys' fees; and

J. Such other and further relief as this Court may deem just and proper.

                                    Respectfully submitted,

                                    Jeffrey Navin by his attorney

Dated: May 4, 2015

                                    Attorney Kenneth R. Davis
                                    Juris Number 14121
                                    1010 Summer Street, Suite 1011
                                    Stamford, CT 06905
                                    Tel: (203) 325 -3519
                                    Fax: (203) 316-0777

                                    And John O'Reilly Pro Se

                                    John O'Reilly
                                    7 Hart Landing
                                    Guilford, CT 06437
                                    Tel: (203) 376-1764
                                    Fax: (203) 457-9975

DEMAND FOR JURY TRIAL